*Desiree Berry and State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Co. v. Andrae Queen, and others similarly situated.*, Misc. No. 10, September Term, 2019; *Maryland Insurance Administration v. State Farm Mutual Automobile Insurance Co.*, No. 63, September Term, 2019.  Opinion by Getty, J.

**INSURANCE LAW—UNINSURED MOTORIST STATUTE—STATUTORY INTERPRETATION—DAMAGE TO PROPERTY**

The Court of Appeals held that the phrase "damage to property"—as incorporated by Maryland's Uninsured Motorist Statute—includes loss of use damages such as rental costs because of the ordinary and popular meaning of the words "damage" and "property," this Court's prior interpretation of property damage, and the context and purpose of the uninsured motorist statute.

United States District Court
for the District of Maryland
Case No. 1:18-cv-02625-PWG

Circuit Court for Baltimore City
Case No. 24-C-19-001819

Argued: May 28, 2020

IN THE COURT OF APPEALS

OF MARYLAND

Misc. No. 10 and No. 63
September Term, 2019

———————————————————

DESIREE BERRY AND STATE FARM
MUTUAL AUTOMOBILE INSURANCE
COMPANY AND STATE FARM FIRE AND
CASUALTY CO.

v.

ANDRAE QUEEN, and others similarly
situated.

———————————————————

MARYLAND INSURANCE
ADMINISTRATION

v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE CO.

———————————————————

Barbera, C.J.
McDonald,
Watts,
Hotten,
Getty,
Booth,
Biran,

JJ.

———————————————————

Opinion by Getty, J.

———————————————————

Filed: July 27, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

> The cost of automobile accidents is high, whether it be measured in lives lost, injuries inflicted, or damage to property. The . . . monetary loss of the victims of automobile accidents [is] exacerbated by situations where one or more of the parties involved turned out to be uninsured.
>
> \- Report of the Task Force on Maryland Automobile Insurance

In the early 1980s, the Maryland General Assembly sought to combat a growing statewide problem: the increased prevalence of uninsured motorists on state roads and highways. A. Janquitto, Maryland Motor Vehicle Insurance (3d ed. 2011), § 3.12(A) at 66–70. Initially, the House Economic Matters Committee formed an insurance task force in 1982. The task force conducted an interim study to recommend ways to enforce Maryland's compulsory insurance laws and reduce the high number of uninsured motorists through new legislative proposals. *See* Final Report of the Insurance Task Force of the House Economics Matters Committee (January 1983), http://dlslibrary.state.md.us/publications/house/EM/MdE2352.3.F491_1983.pdf (last visited on July 21, 2020), archived at https://perma.cc/UF89-KEVV.

In 1984, the General Assembly's Legislative Policy Committee created a bicameral task force to make additional recommendations, such as "[r]efining existing procedures for identifying uninsured motorists in order to minimize the burden on the general motoring public." *See* Report of the Task Force on Maryland Automobile Insurance 2 (December 1984), http://mdlaw.ptfs.com/awweb/pdfopener?md=1&did=8682 (last visited on July 21, 2020), archived at https://perma.cc/C5F9-SE32. The General Assembly's strong policy

determinations that followed these reports have resulted in legislation, over the ensuing forty years, expanding Maryland's Uninsured Motorist Statute to its present state. Md. Code (1957, 2017 Repl. Vol., 2019 Supp.), Insurance ("IN") §§ 19-509 to 19-511.[1]

*Desiree Berry & State Farm Mutual Automobile Insurance Company & State Farm Fire and Casualty Company v. Andrae Queen* ("Misc. No. 10") and *Maryland Insurance Administration v. State Farm Mutual Automobile Insurance Company* ("No. 63") arrived in this Court by different procedural vehicles. Misc. No. 10 is a certified question from the United States District Court for the District of Maryland. No. 63 is an appeal from the Circuit Court of Baltimore City; we granted certiorari while the matter was pending in the Court of Special Appeals. While these appeals have not been formally consolidated, the Court set both matters for oral argument on the same day. Due to the similarity in the underlying facts, and identical legal issue presented in both Misc. No. 10 and No. 63, we issue one opinion.

In both cases, we must determine whether the phrase "damage to property," incorporated by reference in the uninsured motorist statute, requires an insurer to reimburse loss of use damages, such as rental car costs, to an insured. To answer this question, our analysis begins with the ordinary and popular meaning of the words "damage" and "property." Both legal and non-legal sources confirm that these words, together, connote a *loss* of one's ability to *use* an object. Building on this common understanding, our

---

[1] For a more detailed explanation of Maryland's Uninsured Motorist Statute's legislative history, consult *Nationwide Mutual Insurance Co. v. Shilling*, 468 Md. 239, 249–54 (2020).

2

analysis examines this Court's earlier jurisprudence interpreting property damage and related legislation. Two particular cases guide us. This Court's prior articulation of the measure of damages where personal property is injured but not destroyed, beginning in *Washington, Baltimore & Annapolis Electric Railway Co. v. William A. Fingles, Inc.*, 135 Md. 574 (1920), confirms that loss of use damages are part and parcel of "damage to property." Indeed, this Court applied that principle to the uninsured motorist statutory scheme in *D'Ambrogi v. Unsatisfied Claim & Judgment Fund Board*, 269 Md. 198 (1973). There, we held that loss of use damages were recoverable under the predecessor statute to Maryland's Automobile Insurance Fund ("MAIF") because such damages were encompassed in the phrase "damage to property." Finally, as with any exercise of statutory interpretation, we view the phrase in the context and purpose of the larger statutory scheme. Here, such a reading undoubtedly leads this Court to conclude that the phrase "damage to property" includes loss of use damages.

## BACKGROUND

We recently explained that "[u]ninsured and underinsured[2] motorist coverage is a statutorily required component of every motor vehicle liability insurance policy issued in Maryland." *Nationwide Mut. Ins. Co. v. Shilling*, 468 Md. 239, 242 (2020). "This mandatory coverage protects insured drivers involved in motor vehicle accidents from

---

[2] These terms are synonymous. *See Shilling*, 468 Md. at 248–49 (citation omitted) ("[A]n *un*insured motorist or motor vehicle is, for all intents and purposes, the same as an *under*insured motorist or motor vehicle.").

paying out-of-pocket expenses when the liable party, a tortfeasor, is either completely uninsured or inadequately insured to cover the extent of the insured's injuries." *Id.*

The underlying facts of these cases do not affect our analysis. Still, we briefly summarize them for context.

*Misc. No. 10*

The following information is derived from the U.S. District Court's Certification Order. Andrae Queen owned a car and obtained a motor vehicle liability insurance policy through State Farm Fire and Casualty Company ("State Farm"). Mr. Queen did not purchase the optional rental car coverage as a part of the policy. On February 15, 2018, an uninsured motorist struck Mr. Queen while he was operating his car in St. Mary's County, Maryland. The accident damaged Mr. Queen's vehicle. As a result, Mr. Queen obtained a rental car—which cost $306.23—while his car was being repaired. Mr. Queen submitted a claim with State Farm under the Uninsured Motor Vehicle Property Damage Coverage[3] portion of his policy to recover his rental car expenditure. State Farm denied the claim.

Mr. Queen filed suit against State Farm in the Circuit Court for Baltimore City on behalf of himself and sought to proceed as a class action. State Farm removed the action

---

[3] The Uninsured Motor Vehicle Property Damage Coverage portion of Mr. Queen's policy provides for coverage of "Bodily Injury" and "Property Damage" and defines property damage as follows:

> ***Property Damage*** means damage to or destruction of:
>
> 1. ***your car*** or a ***newly acquired car***; and
> 2. property ***owned by*** **an** ***insured*** while contained in ***your car*** or a ***newly acquired car***.

4

to the United States District Court for the District of Maryland and filed a motion to dismiss. In a Memorandum Opinion and Order, the U.S. District Court denied State Farm's motion. *See Queen v. State Farm Mut. Auto. Ins. Co.*, No. PWG-18-2625, 2019 WL 2568336 (D. Md. June 20, 2019). The U.S. District Court determined that under Maryland law, "[Mr.] Queen ha[d] stated plausible claims, notwithstanding the unambiguous language of the [State Farm Insurance] Policy excluding the coverage [Mr.] Queen demand[ed]." *Id.* at *5. The U.S. District Court ordered State Farm to answer Mr. Queen's complaint.

At State Farm's request, the U.S. District Court then certified a question of law to this Court pursuant to the Maryland Uniform Certification of Questions of Law Act. Md. Code (1957, 2013 Repl. Vol.), Courts & Judicial Proceedings § 12-601 *et seq*. This Court accepted the certified question on November 22, 2020. State Farm filed, with Mr. Queen's consent, a motion to accelerate the briefing schedule and set the matter for oral argument with No. 63, which we granted on December 10, 2019.

### No. 63

The following information is derived from the Joint Stipulation of Facts agreed upon by the Maryland Insurance Administration (the "Administration") and State Farm.[4] Arndrea Hoyle owned a car and obtained a motor vehicle liability insurance policy through

---

(Emphasis in original).

[4] We see no principled reason to distinguish "State Farm" of Misc. No. 10 and "State Farm" of No. 63. In the discussion below, we refer to a singular "State Farm." In both cases, State Farm is represented by the same counsel and makes principally the same arguments.

5

State Farm. Ms. Hoyle's policy included the following coverage: (1) Car Rental Expense

Coverage,[5] providing eighty percent of car rental expenses up to the $1,000 limit; (2)

---

[5] In pertinent part, the policy provides:

**PHYSICAL DAMAGES COVERAGE**

This policy provides:

> 4.     Car Rental and Travel Expenses Coverage if "R1" is shown under the "SYMBOLS" on the Declarations Page.

**Insuring Agreements**

> 4.     **Car Rental and Travel Expenses Coverage**
>
> > a.     **Car Rental Expense**
> >
> > *We* will pay the ***daily rental charge*** incurred when ***you*** rent a ***car*** from a ***car business*** while your ***car*** . . . is:
> >
> > (2) being repaired . . . as a result of a loss which would be payable under . . . Collision Coverage.

**Limits – Car Rental and Travel Expenses Coverage**

> **1.**     **Car Rental Expense**
>
> The limit for Car Rental Expense is shown on the Declarations Page under "Limit – Car Rental Expense – Each Day, Each Loss.
>
> > a.     The limit shown under "Each Day" is the most *we* will pay for the ***daily rental charge***. If:
> >
> > > (1) a dollar amount is shown, then *we* will pay the ***daily rental charge*** up to that dollar amount; or
> > >
> > > (2) a percentage amount is shown, then we will pay that percentage of the daily rental charge.

(Emphasis in original).

Collision Coverage,[6] with a $250 deductible; and (3) Uninsured Motorist Coverage, with a $250 deductible.[7] The uninsured motorist coverage obligated Ms. Hoyle to pay a separate premium charge of $55.59 per policy period, which she paid.

On January 5, 2018, an unidentified vehicle struck and damaged Ms. Hoyle's car while it was parked and unoccupied. That same day, Ms. Hoyle submitted a claim with State Farm. State Farm responded with a coverage letter, which stated, in pertinent part:

---

[6] In pertinent part, the policy provides:

### PHYSICAL DAMAGES COVERAGE

This policy provides:

    2.    Collision Coverage is [sic] "G" is shown under the "SYMBOLS" on the Declarations Page.

**Insuring Agreements**

    2.    **Collision Coverage**

    a.    *We* will pay the *loss caused by collision* to a *covered vehicle.*

(Emphasis in original).

[7] In pertinent part, the policy provides:

### UNINSURED MOTOR VEHICLE COVERAGE

**Insuring Agreement**

*We* will pay compensatory damages for *bodily injury* and *property damage* an *insured* is legally entitled to recover from the owner or driver of an *uninsured motor vehicle*.

**Limits**

**2.**    **Property Damage**

The Uninsured Motor Vehicle Coverage limit for *property damage* is shown under the Declarations Page under

7

The policy provides uninsured motorist property damage coverage for property damages you are legally entitled to collect from the owner or driver of an uninsured motor vehicle. Damages may include the repair costs, actual cash value of the property and diminished value, if any. Based upon our investigation, your uninsured motorist property damage coverage will apply to this loss.

State Farm paid Ms. Hoyle $369.78 pursuant to the policy's Collision Coverage provision for property damage to the vehicle.[8]

While Ms. Hoyle's car was being repaired, she rented a replacement from Hertz Corporation, a car rental agency. In total, the rental car cost $264.07. State Farm paid Hertz directly in the amount of $208.40: eighty percent of the daily rental rate, plus tax,

---

"Uninsured Motor Vehicle Coverage – Property Damage Limit – Each Accident." This limit is the most *we* will pay for all *property damage* resulting from any one accident.

"*Property Damage*" is specifically defined in the Policy as:

damage to or destruction of:

(1) your *car* or a *newly acquired car*; and

(2) property *owned by* an *insured* while contained in *your car* or a *newly acquired car*.

**Exclusions**

THERE IS NO COVERAGE:

8. FOR THE FIRST $250 OF *PROPERTY DAMAGE* RESULTING FROM ONE ACCIDENT.

[8] The policy also contains a nonduplication provision, which provides:

*We* will not pay under Uninsured Motor Vehicle Coverage any damages:

**2.** that are property damages and could have been paid or could be paid to or for the *insured*:

c. under any policy of property insurance.

8

pursuant to the Car Rental Expense provision of the policy. State Farm did not pay Ms. Hoyle the balance—$55.67—which represented twenty percent of the total rental car expense.

Ms. Hoyle filed an administrative complaint with the Administration, which reviewed the complaint and issued a determination letter on April 27, 2018. In the letter, the Administration concluded that State Farm acted without just cause and in an arbitrary and capricious manner when it denied Ms. Hoyle's claim for rental car expenses. *See* IN §§ 4-113 and 27-303(2). Therefore, the Administration directed State Farm to pay Ms. Hoyle's out-of-pocket rental expenses.

State Farm disagreed and requested a hearing before an administrative law judge. The Administration and State Farm filed Cross Motions for Summary Decision, acknowledging that there was no dispute of fact and the only issue for resolution involved whether State Farm violated IN §§ 4-113 and 27-303(2). The parties appeared for an administrative hearing on January 24, 2019. One month later, the Associate Insurance Commissioner issued a Final Order granting the Administration's Motion for Summary Decision and denying State Farm's Motion for Summary Decision. The Associate Commissioner's order affirmed the Administration's initial determination.

State Farm filed a petition for judicial review in the Circuit Court for Baltimore City. The circuit court held a hearing on September 25, 2019. After reviewing the parties' filings and hearing argument, the circuit court determined that the Associate Commissioner premised its decision on an error of law. As a result, the circuit court entered summary decision in favor of State Farm. The Administration noted an appeal to the Court of Special

9

Appeals. While still pending in that court, we granted certiorari. *Md. Ins. Admin. v. State Farm Mut. Auto. Ins. Co.*, 466 Md. 513, 513 (2019).

*Question Presented*

Both cases present a single, identical question of law for this Court's review:

> Whether the Maryland Uninsured Motorist statutory provision of Md. Code Ann., Ins. §19-509(e)(1), and the provisions of Title 17 of the Transportation Article [("TR")] and Title 20 Subtitle 6 of the Insurance Article incorporated therein, require an insurer to pay benefits for loss of use of a vehicle damaged by an uninsured driver, regardless of any limitations or omissions that may exist in the applicable policy of insurance.

For the reasons that follow, we hold that the phrase "damage to property," as incorporated by reference in the uninsured motorist statute, embraces loss of use damages. Consequently, an insurer is required to provide uninsured motorist coverage for loss of use damages, such as rental costs, caused by an uninsured driver, regardless of a policy's limitations or purported omissions to the contrary.

## DISCUSSION

### A. *The Parties' Contentions.*

*Misc. No. 10*

State Farm contends that the uninsured motorist statute is unambiguous and fails to provide for loss of use damages. State Farm's argument focuses less on the express language of the statute and more on text it believes is missing. Specifically, State Farm asserts that the words "loss of use" or "rental car coverage" must explicitly appear in the statute for it to cover such damages. State Farm distinguishes *D'Ambrogi* as inapplicable

10

because that case interpreted now-inapplicable statutory language since replaced by the statutory scheme implicated in the instant case.

Mr. Queen counters that the term "damage to property," as it has been defined in our case law, recognizes recovery for loss of use damages. In Mr. Queen's view, this Court's interpretation of MAIF's predecessor statute in *D'Ambrogi* is instructive. More broadly, Mr. Queen contends that the uninsured motorist statute's remedial nature encourages a liberal construction to effectuate its purpose; i.e., assuring that innocent victims recover when injured at the hands of uninsured motorists.

*No. 63*

The Administration argues that the Associate Commissioner properly interpreted IN § 19-509 and TR § 17-103. The Administration contends that IN § 19-509 requires an insurer to provide uninsured motorist coverage equal to the liability coverage all Maryland drivers must maintain under Title 17 of the Transportation Article. In turn, the minimum liability coverage requirements of TR § 17-103 provide for reasonable rental car expenses—i.e., loss of use damages—when an innocent claimant's car is being repaired. Against this statutory framework, the Administration maintains that State Farm's denial of Ms. Hoyle's claim for loss of use damages was arbitrary and capricious because the denial was not undertaken pursuant to a lawful principle.

State Farm counters with the language of Ms. Hoyle's motor vehicle insurance policy; specifically, that the uninsured motorist provisions of the policy do not include rental car expenses. More broadly, State Farm responds that the uninsured motorist statute clearly and unambiguously does not provide coverage for loss of use damages. In State

11

Farm's view, it is not responsible for loss of use damages because (1) the text of the statute does not explicitly include "loss of use"; (2) the phrase "damage to property" cannot be defined as including loss of use; and (3) the General Assembly could have included coverage for "damages resulting from" property damage, but it did not. Finally, State Farm asserts that its denial of Ms. Hoyle's claim for rental expenses was not arbitrary and capricious; rather, that it denied coverage according to a lawful principle.

## B.     *Principles of Statutory Interpretation.*

Before engaging with the statutory language, we reiterate the pertinent guiding principles of statutory interpretation. The interpretation of a statute is a question of law that this Court reviews *de novo*. *Johnson v. State*, 467 Md. 362, 371 (2020). Our chief objective is to ascertain the General Assembly's purpose and intent when it enacted the statute. *Neal v. Balt. City Bd. of Sch. Comm'rs*, 467 Md. 399, 415 (2020) (citing *Wash. Gas Light Co. v. Md. Pub. Serv. Comm'n*, 460 Md. 667, 682 (2018)). It is well established that

> [t]his Court provides judicial deference to the policy decisions enacted into law by the General Assembly. We assume that the legislature's intent is expressed in the statutory language and thus our statutory interpretation focuses primarily on the language of the statute to determine the purpose and intent of the General Assembly. We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute

12

as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.

*Brown v. State*, 454 Md. 546, 550–51 (2017) (quoting *Phillips v. State*, 451 Md. 180, 196–97 (2017)).

Our inquiry is not confined to the specific statutory provision at issue on appeal. *Neal*, 467 Md. at 415. Instead, "[t]he plain language 'must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim or policy of the Legislature in enacting the statute.'" *Johnson*, 467 Md. at 372 (quoting *State v. Johnson*, 415 Md. 413, 421 (2010)). To this end, it may be beneficial to "analyze the statute's 'relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case.'" *Blackstone v. Sharma*, 461 Md. 87, 114 (2018) (quoting *Kaczorowski v. Mayor & City Council of Balt.*, 309 Md. 505, 515 (1987)).

While not necessary in every instance, we often find it prudent to scrutinize the legislative history to confirm that our interpretation of the statute's plain language accords with the legislature's intent. *Neal*, 467 Md. at 415–16; *see also In re: S.K.*, 466 Md. 31, 50 (2019) ("In addition to the plain language, the modern tendency of this Court is to continue the analysis of the statute beyond the plain meaning to examine 'extrinsic sources of legislative intent' in order to 'check [ ] our reading of a statute's plain language' through examining 'the context of a statute, the overall statutory scheme, and archival legislative history of relevant enactments.'" (alteration in original) (quoting *Brown*, 454 Md. at 551));

*State v. Roshchin*, 446 Md. 128, 140 (2016) ("[E]ven when the language is unambiguous, it is useful to review legislative history of the statute to confirm that interpretation and to eliminate another version of legislative intent alleged to be latent in the language.").

## C.     The Term "Damage to Property" Includes "Loss of Use."

Our analysis begins by discerning the ordinary and popular meaning of the words we seek to interpret: "damage" and "property."  Words, however, often have multiple meanings.  As a result, we look to the context in which the words are used.  This Court has examined the measure of damages involving injury to property in our early jurisprudence.  Additionally, the broad purpose of the uninsured motorist statute informs the proper meaning of the phrase.  Our independent interpretation of the phrase is confirmed by subsequent legislative action amending the statutory language of IN § 19-509.

### 1.     The Ordinary and Popular Understanding of "Damage" and "Property."

As a starting point, we first consider the dictionary definitions of the words "damage" and "property" to derive their common understanding as those words are used in the English language.[9]  This is an essential starting point because the "ordinary, popular understanding of the English language dictates interpretation of [the statute's]

---

[9] *See Couret-Rios v. Fire & Police Emps'. Ret. Sys. of Balt.*, 468 Md. 508, 530 n.8 (2020) ("To determine the ordinary meaning of those words, we find it helpful to consult their dictionary definitions." (quoting *Neal*, 467 Md. at 417 n.10)); *see also Marriott Emps. Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 447 (1997) ("Although dictionary definitions do not provide dispositive resolutions of the meaning of statutory terms, dictionaries do provide a useful starting point for determining what statutory terms mean, at least in the abstract, by suggesting what the legislature could have meant by using particular terms." (internal citations and original alteration omitted)).

terminology." *Johnson*, 467 Md. at 372 (quoting *Blackstone*, 461 Md. at 113). Here, as to whether the phrase "damage to property" contemplates loss of use damages, the definitions of "damage" and "property" are telling.

The word "damage" is defined in similar ways in both legal and non-legal sources. Black's Law Dictionary defines "damage" in part as "[l]oss or injury to person or property." Black's Law Dictionary 488 (11th ed. 2019); *see also Damage*, Garner's Dictionary of Legal Usage 242 (3d ed. 2011) (defining the term as "[l]oss, injury or deterioration"). Merriam-Webster defines the term as "loss or harm resulting from injury to person [or] property." *Damage*, Merriam-Webster, https://www.merriam-webster.com/dictionary/damage (last visited on July 21, 2020), archived at https://perma.cc/5NK3-DMSV. What plainly appears across these definitions is that a "loss" is customarily associated with damage.

The legal and non-legal definitions of "property" also accord with each other. Black's Law Dictionary defines "property" in part as "the rights in a valued resource such as . . . chattel[; or a]ny external thing over which the rights of possession, use, and enjoyment are exercised." Black's Law Dictionary 1470 (11th ed. 2019).[10] Merriam-Webster likewise provides the following pertinent definitions: "something owned or

---

[10] Garner's Dictionary of Legal Usage mirrors this definition:

> The traditional legal meaning of the term is "a right over a determinate thing, either a tract of land or a chattel." The transferred sense that nonlawyers commonly attach to the term is "any external thing over which the rights of possession, use, and enjoyment are exercised."

*Property*, Garner's Dictionary of Legal Usage 721 (3d ed. 2011).

15

possessed[;] the exclusive right to possess, enjoy and dispose of a thing[; or] something to which a person . . . has a legal title." *Property*, Merriam-Webster, https://www.merriam-webster.com/dictionary/property (last visited on July 21, 2020), archived at https://perma.cc/JT6J-AVZ6. These definitions confirm the uncontroversial notion that, as relevant here, "property" is a thing that an individual may use as he or she sees fit.

From these sources, we glean that the term "damage" necessarily means a loss of something. Simply put, to equate "damage" with its ordinary understanding—a loss of some sort—is not an imaginative leap; such an interpretation naturally flows from the word's definitions. The remaining question, then, is loss of what? Fortunately, that portion of the equation is exceedingly straightforward: a loss of property. Inherent in the concept of property is the right to enjoy, possess and *use* the object. Fundamentally then, the essence of the term "damage to property" means that the lawful owner is deprived of the ability to apply the object in a manner that he or she desires—i.e., a loss of use.

We find these definitions enlightening; however, "[w]ords can have multiple meanings and often do. And the numerous meanings of a particular word may each satisfy the ordinary and popular understanding of that word. In order to interpret a word's specific meaning in a particular statute we look to the context in which the word is used." *Chow v. State*, 393 Md. 431, 448 (2006). With this foundation, we turn to early cases in which this Court articulated the types of damages encompassed by the concept of damage to property:

16

*Washington, Baltimore & Annapolis Electric Railway Co. v. William A. Fingles, Inc.*, 135 Md. 574 (1920) ("*Fingles*") and *Taylor v. King*, 241 Md. 50 (1965).

2.      *Case Law Interpreting Damage to Property.*

In *Fingles*, a motor vehicle accident between two vehicles—one operated by Charles Bransby and the other operated by a Washington, Baltimore & Annapolis Electric Railway (the "Railway") employee—caused damage to William Fingles' passenger car. 135 Md. at 575–76.  As a result, Mr. Fingles' vehicle "was materially damaged, and [Mr. Fingles] was deprived of the use thereof." *Id.* at 576.  The accident further deprived Mr. Fingles of the use of his vehicle "for a considerable length of time while the [car was] overhauled and repaired." *Id.*  A trial ensued, and as it is relevant here, resulted in a judgment in favor of Mr. Fingles against the Railway in excess of seven hundred dollars. *Id.* The Railway appealed, arguing among other things that the court improperly calculated the damage amount.

Ultimately, the *Fingles* Court found no error and affirmed the judgment, which awarded a sum of money for loss of use damages. *Id.* at 583.  In reaching this conclusion, we quoted Volume 17 of the *Corpus Juris*[11] and said, "the measure of damages for injury to personal property, which has not been entirely destroyed, according to some authorities, 'is the cost of repairing (the property), together with the value of the use of the property

---

[11] *Corpus Juris*, first published in 1914, is the second in a series of three legal encyclopedias providing a comprehensive review of the "body of law." *See Kazadi v. State*, 467 Md. 1, 39 n.9 (2020).

17

during the time it would take to repair it.'" *Id.* at 579–80 (alteration in original) (quoting 17 C. J. § 183(b), 877).

The *Fingles* Court only cited to the *Corpus Juris* in passing; we pause to offer a more detailed explanation. From the broader section entitled "Damages," the Court quoted an excerpt of "Injuries to Personal Property—Injuries Short of Loss or Destruction." In full, that passage provides the following:

> The measure of damages for an injury to personal property which has not been entirely destroyed is the difference between its value at the place immediately before and immediately after the injury. Where personal property has been wrongfully seized by a public officer acting in good faith, the measure of damages is the difference in value of the property at the time and place where seized and the time and place where returned to the possession of the plaintiffs. *According to some authorities, however, it is the amount required to restore the property to its previous condition, or the cost of repairing together with the value of the use of the property during the time that it would take to repair it, or the reasonable cost of repairs.* Where the difference in the value of the article before and after the injury will not afford a fair measure of the owner's real loss, a different standard may be resorted to, such as the fair cost of repairs made necessary by the injury, less the increased value of the repaired article, if any, over its value before the accident. However, evidence of the value of the article before and after the accident may be fairly considered with the other facts in the case from which the amount of plaintiff's loss may be determined. The amount awarded must be less than the value of the property before it was injured.

17 C.J. § 183(b), 877–78 (footnotes omitted and emphasis added). Reading this passage in full makes clear that the *Fingles* Court made a conscious decision to calculate damage to property as including the "value of the use of the property during the time that it would take to repair it." Indeed, 17 C.J. § 183 surveys different approaches taken by courts across the country in defining damage to property where the property has not been entirely destroyed. While this Court could have defined damage to property as "the amount

18

required to restore the property to its previous condition" or "the reasonable cost of repairs," we declined the opportunity. Instead, as the plain and ordinary understanding of the words indicate, we defined the term as including the value of the use while the property is repaired.[12]

Since *Fingles*, we have had occasion to reaffirm the proposition that the measure of damages for injury to property includes the "value of the use of the property during the time it would take to repair" the property. *See, e.g.*, *Fisher v. City Dairy Co.*, 137 Md. 601, 603 (1921) ("In [*Fingles*], this Court held that the measure of damages for injury to personal property, where the property has been damaged but not entirely destroyed, is the cost of repairing the property, together with the value of the use of the property during the time that it would take to repair it."); *Hopper, McGaw & Co. v. Kelly*, 145 Md. 161, 167 (1924) ("In [*Fingles*], this Court quoted with approval the statement in 17 *Corpus Juris*, 877, that the measure of damages for injury to personal property, which has not been totally destroyed, 'is the cost of repairing (the property) together with the value of the use of the

---

[12] The outcome in *Fingles* accords with the meaning of the word "damage" at the time of that case. Returning momentarily to the ordinary and popular understanding of "damage," the *Corpus Juris* is exceptionally enlightening. It provides several definitions, the most insightful of which include "[l]oss, injury or deterioration, caused by the negligence, or accident of one person to another, in respect to the latter's person or property," "the loss caused by one person to another, or to his property . . . with negligence and carelessness, or by inevitable accident," and "the loss or injury which results from an unlawful act." *Damage*, 17 C.J. 698. These definitions confirm the modern-day usage of the word "damage" aligns with our understanding of the word's meaning when this Court determined the types of damages encompassed by the concept of "damage to property."

19

property during the time it would take to repair it,' and there is nothing . . . in this case requiring the application of a different rule.").

Forty-five years after *Fingles*, in *Taylor v. King*, this Court confronted the issue yet again. 241 Md. at 53–55. *Taylor*, like *Fingles*, required us to determine the proper measure of damages recoverable when an automobile was damaged, but not completely destroyed. *Id.* at 51. Reiterating our pronouncement in *Fingles*, and its confirmation in *Fisher*, we ultimately held that

> the rule in Maryland with respect to the measure of damages for injury to a motor vehicle, which has not been entirely destroyed, is the reasonable cost of the repairs necessary to restore it to substantially the same condition that it was in before the injury, provided the cost of repairs is less than the diminution in market value due to the injury. And when the cost of restoring a motor vehicle to substantially the same condition is greater than the diminution in market value, the measure of damages is the difference between its market value immediately before and immediately after the injury. In addition, *the measure of damages may include a reasonable allowance for loss of use of the vehicle*.

*Id.* at 54–55 (footnote omitted and emphasis added). Against this uniform framework, wherein the Court has incorporated the value of the loss of use in calculating damage to property under our common law, we turn to our prior statutory interpretation of the phrase.[13]

*3.*      D'Ambrogi v. Unsatisfied Claim and Judgment Fund Board.

In 1972, the General Assembly enacted legislation to create Maryland's Uninsured Motorist Statute and MAIF. *Shilling*, 468 Md. at 249; *State Farm Mut. Auto. Ins. Co. v.*

---

[13] State Farm suggests that because these cases, specifically *Taylor*, sound in common law tort, they are inapposite to our analysis of the statutory language in this case. We disagree. An insured's claim against an uninsured motorist that causes injury—a tortfeasor—

*DeHaan*, 393 Md. 163, 171 (2006); 1972 Md. Laws, ch. 73. MAIF, a state-owned automobile insurance company, was created to provide motor vehicle insurance to individuals unable to obtain a policy in the private market. *Van Horn v. Atlantic Mut. Ins. Co.*, 334 Md. 669, 681 (1994). Beyond this function, MAIF succeeded the Unsatisfied Claims and Judgment Fund ("UCJF" or the "Fund") "in its role of protecting innocent persons injured by uninsured or improperly insured motorists, and not covered by an uninsured motorist endorsement." *Nationwide Mut. Ins. Co. v. Webb*, 291 Md. 721, 726 n.3 (1981). As noted above, and consistent with our primary goal of statutory interpretation, it is beneficial to consider earlier, related legislation. *See Blackstone*, 461 Md. at 114. Fortunately, in *D'Ambrogi*, this Court interpreted a provision of the UCJF statute—the predecessor of the MAIF statute—concerning damage to property.

*D'Ambrogi* involved another motor vehicle accident and the amount of recoverable damages. There, Frances Gray was operating an automobile when she struck Paul D'Ambrogi's truck. 269 Md. at 199. As a result of the damage to his truck, Mr. D'Ambrogi paid $862.92 to rent a truck while his was being repaired. *Id.* Mr. D'Ambrogi brought suit and the Circuit Court for Anne Arundel County entered judgment against Mrs. Gray and her husband in the amount of $1,512.92. A component of the damage award accounted "for loss of the use of [Mr. D'Ambrogi's] truck"—i.e., the cost of obtaining a rental vehicle. *Id.* When the Grays failed to pay the judgment, Mr. D'Ambrogi sought

---

intrinsically implicates tort law. Prior cases discussing the proper measure of damages when injury to property occurred, even before the existence of the uninsured motorist statute, are instructive.

21

compensation from the Fund. *Id.* The circuit court ordered that the Fund pay the portion of the judgment relating to Mr. D'Ambrogi's personal injuries but denied the loss of use damages. *Id.* Mr. D'Ambrogi appealed. *Id.*

On appeal, the *D'Ambrogi* Court began its analysis with the relevant language of the UCJF statute:

> Any qualified person, who suffers damages resulting from bodily injury or death or damage to property arising out of the ownership, maintenance, or use of a motor vehicle . . . [shall give notice to the Fund of an intention to make a claim for damages otherwise uncollectible].

*Id.* at 200 (alteration in original) (quoting Article 66 1/2 § 7-606(a)). Mr. D'Ambrogi argued that "damage sustained as a result of loss of use of a motor vehicle [was] properly payable from the Fund." *Id.* at 199. The Fund countered that, for Mr. D'Ambrogi to prevail, the UCJF statute must have used—but did not—the phrase "damages resulting from" to modify "damage to property." *Id.* at 200. The Fund contended that, to do so, the statute should have read: "[a]ny qualified person, who suffers damages resulting from bodily injury or death or [damages resulting from] damage to property . . . ." *Id.* We determined that Mr. D'Ambrogi had the "better of the argument" on two grounds. *Id.* First, we agreed with Mr. D'Ambrogi's ancillary argument that the remedial nature of the statute encouraged a liberal construction designed to afford relief. *Id.* Second, and importantly for our purposes, we concluded that

> [n]o extensive citation of authority is necessary to support the proposition that the measure of damages for injury to personal property which has not been entirely destroyed is *the cost of repairing the property together with the value of the use of the property during the time it would take to repair it.*

*Id.* at 201 (emphasis added) (citing *Fingles*, 135 Md. at 579–80).  As a result, this Court

reversed the judgment of the circuit court and ordered that the Fund compensate Mr.

D'Ambrogi for loss of use damages.  Implicit in this result is the notion that the statute's

inclusion of the phrase "damage to property" encompassed loss of use damages.  The

qualifying language—"damages resulting from"—did not need to modify "damage to

property" in large part because of the settled proposition tracing back to *Fingles*: the value

of the use of the property while it undergoes repair is included in the measure of damage

to property.

4.      *Interpreting "Damage to Property" as Incorporated by IN § 19-509(e).*

We now turn to the statutory language before us: "damage to property."  IN § 19-

509(e)(1)[14] requires that a motor vehicle liability insurance policy contain uninsured

motorist coverage equal to at least the amounts set out in Maryland's financial

responsibility law—codified at TR § 17-101 *et seq.*—and the MAIF statute—codified at

IN § 20-601 *et seq*.  As applied to this case, the financial responsibility law requires

adequate security to provide at least for "[t]he payment of claims for property of others

---

[14] IN § 19-509(e) provides, in pertinent part:

> (e)(1) The uninsured motorist coverage contained in a motor vehicle
> liability insurance policy:
>
>> (i) shall at least equal:
>>
>>> 1. the amounts required by Title 17 of the Transportation
>>> Article; and
>>> 2. the coverage provided to a qualified person under Title 20,
>>> Subtitle 6 of this article.

damaged or destroyed in an accident of up to $15,000, in addition to interest and costs." TR § 17-103(b)(2). The MAIF statute, subject to limitations, permits claims against the Fund if "the claim is for . . . *damage to property* greater than $250." IN § 20-601(b)(1)(i) (emphasis added). The maximum amount payable from the Fund is "$15,000 for damages to property." IN § 20-602(a)(3).

In our analysis of this language, State Farm urges us to ignore *D'Ambrogi* because that case interpreted the statutory language of Article 66 1/2 § 7-606, a now-inapplicable statute. State Farm suggests *D'Ambrogi* is "entirely inapplicable" because the "damages resulting from" language does not appear in the current uninsured motorist statute. Further, State Farm contends that the *D'Ambrogi* Court found the "damages resulting from" language "persuasive" in determining that the Fund should pay loss of use damages. We disagree.

In *D'Ambrogi*, we interpreted the phrase "damage to property"—without the prefatory language "damages resulting from"—as including loss of use damages. In this regard, we think the U.S. District Court's reading of *D'Ambrogi* aptly summarizes our view:

> Significantly, not only did [this Court] not agree with the Fund that the phrase "damages resulting from" needed to appear immediately before "damage to property" for "damage to property" to include damages for loss of use, but it also did not construe the statutory language to refer to "damages resulting from damage to property." Indeed, the statute refers to "damages resulting from bodily injury or death" and "damage to property," not "damages resulting from bodily injury, death, or damage to property," such that, as the Fund asserted, it does not explicitly cover "damages resulting from damage to property." Nonetheless, [this C]ourt concluded that the phrase "damage to property" on its own (*not* the broader language "damages resulting from damage to property") included loss of use damages.

24

*Queen*, 2019 WL 2568336, at \*5 (citations omitted and emphasis in original). The General Assembly's decision to remove the prefatory clause "damages resulting from" when it enacted the MAIF statute does not render *D'Ambrogi* inapplicable. It is clear that neither our analysis nor the result in *D'Ambrogi* relied, even in small part, on the prefatory language "damages resulting from."

This Court presumes that the General Assembly is aware of our jurisprudence when it enacts new legislation. *Allen v. State*, 402 Md. 59, 72 (2007). Where the General Assembly does not clearly abrogate a particular holding, we conclude that it has acquiesced in the outcome. *Id.*; *see also WSC/2005 LLC v. Trio Ventures Assocs.*, 460 Md. 244, 258 (2018) ("Although the Legislature may abrogate the common law through statutory enactments, we have also required a strong pronouncement from the Legislature as evidence of an intention to do so."). It is clear, then, absent a strong indication to the contrary, that the General Assembly's post-1973 modifications to the uninsured motorist statute have accounted for the *D'Ambrogi* Court's interpretation of "damage to property"— i.e., that the phrase includes loss of use damages.

Viewing "damages to property" in the context of the uninsured motorist statute, and considering the purpose and policy of the General Assembly in enacting this statutory scheme, urges the same result. *See Johnson*, 467 Md. at 372. This Court has often reiterated that the purpose of the uninsured motorist statute is to protect innocent individuals injured by uninsured motorists as if the uninsured tortfeasor carried motor vehicle liability insurance in the amounts required by law. *See Erie Ins. Exch. v. Heffernan*,

25

399 Md. 598, 612 (2007) ("The purpose of the uninsured motorist statute is to provide minimum protection for individuals injured by uninsured motorists . . . ."); *Webb*, 291 Md. at 737 ("[T]he purpose of uninsured motorist statutes is that each insured under such coverage have available the full statutory minimum to exactly the same extent as would have been available had the tortfeasor complied with the minimum requirements of the [statute.]" (internal quotation marks omitted)); *Kritsings v. State Farm Mut. Auto. Ins. Co.*, 189 Md. App. 367, 375 (2009) ("The effect [of the uninsured motorist statute is] to provide an injured insured with compensation equal to that which would have been available had the tortfeasor carried liability insurance in an amount equal to the amount of the injured insured's [uninsured motorist] coverage.").

Indeed, the uninsured motorist statute is designed to achieve a worthy goal: restoring injured insureds to the same position they occupied before being injured by an uninsured motorist. The remedial nature of the statute requires a liberal construction to carry out the statute's purpose. *DeHaan*, 393 Md. at 176; *see also State Farm Mut. Auto. Ins. Co. v. Md. Auto. Ins. Fund*, 277 Md. 602, 605 (1976) (noting that "the remedial nature of the statutory plan . . . dictates a liberal construction in order to effectuate its purpose of assuring recovery for innocent victims of motor vehicle accidents"). It is no surprise, then, that reading the phrase "damage to property" as including loss of use damages harmonizes the plain language of the statute with its purpose.

As such, mindful of the ordinary and popular meaning of the words "damage" and "property," and cognizant of the uniform interpretation of the phrase in our case law, we conclude that the phrase "damage to property" encompasses loss of use damages.

26

Therefore, IN § 19-509(e), which incorporates by reference TR § 17-101 *et seq.* and IN § 20-601 *et seq.*, requires that uninsured motorist coverage reimburse "the value of the use of the property during the time it would take to repair it." *Fingles*, 135 Md. at 579–80 (quoting 17 C. J. § 183(b), 877).

5.       *A Sequel: House Bill 144 of the General Assembly's 2020 Regular Session.*

Since the issuance of the Circuit Court for Baltimore City's order in No. 63, the General Assembly enacted new legislation revising the uninsured motorist statute. House Bill 144 of the 2020 Regular Session ("H.B. 144")—a departmental bill[15]—became law just twenty days before oral argument in these cases. 2020 Md. Laws, ch. 77. The legislation made a simple, yet notable alteration to the language of IN § 19-509(c) and (e).

---

[15] We have explained:

> For a bill to be introduced in the General Assembly, it must be sponsored by a member of the Senate or House of Delegates. There is no constitutional provision for the introduction of bills from other sources, such as a citizen's initiative for legislation or draft legislation submitted directly by the voters. However, there are two exceptions to this rule: (1) administration bills, which provide the Governor an opportunity to introduce major initiatives; and (2) *departmental bills, which constitute requests from departments and agencies to make revisions to statutes for general housekeeping purposes or to close loopholes*. *See* Library and Information Services, Maryland Department of Legislative Services, *Legislative Lingo*, at 5 (defining a departmental bill as a "bill introduced by a committee chairman at the request of the Executive Branch of State government."). As part of a long-standing courtesy provided by custom in the General Assembly, the bills requested by the departments are introduced by committee chairmen as described in the Legislator's Handbook. *See* Department of Legislative Reference, Maryland General Assembly, *Legislator's Handbook*, at 13, 49 (1990).

*Blackstone*, 461 Md. at 126 n.19 (emphasis added).

27

We lay out the prior language of the statute in regular typeface and H.B. 144's revised

language in bold:

> (c) In addition to any other coverage required by this subtitle, each motor vehicle liability insurance policy issued, sold, or delivered in the State after July 1, 1975, shall contain coverage for damages, subject to the policy limits, that:
>
> * * *
>
> > (2) **the insured is entitled to recover from the owner or operator of an uninsured motor vehicle because of property damage, including loss of use of the insured vehicle . . . .**
>
> * * *
>
> (e)(1) The uninsured motorist coverage contained in a motor vehicle liability insurance policy:
>
> > (i) shall at least equal:
> >
> > 1. the amounts required by Title 17 of the Transportation Article **for bodily injury and property damage, including loss of use of the insured vehicle . . . .**

IN § 19-509.

House Bill 144 originated in response to the Circuit Court for Baltimore City's order

in case No. 63. The Fiscal and Policy Note indicates as much:

> A recently issued circuit court ruling interpreted § 19-509 of the Insurance Article as not requiring [uninsured] . . . coverage to pay for the loss of use of the insured's vehicle (which typically means reimbursement for a rental car). [The Administration] advises this is a departure from how it and almost every private passenger automobile insurer interprets that provision. Thus, the bill clarifies that such coverage must pay for the loss of use of the insured's vehicle.

*Dep't Legis. Servs., Fiscal and Policy Note*, House Bill 144, at 2 (2020 Session).

28

Understandably, the parties ascribe differing levels of significance to H.B. 144. On one hand, State Farm argues that the legislation is a substantive revision to the uninsured motorist statute. In State Farm's view, H.B. 144 adds a new requirement that makes loss of use coverage mandatory. From this perspective, State Farm argues that the uninsured motorist statute in effect at the time of these cases does not mention, or therefore include, loss of use coverage. On the other hand, Mr. Queen and the Administration view H.B. 144 as a non-substantive, corrective bill. In their view, IN § 19-509 always required insurers to provide loss of use damages as a part of uninsured motorist coverage. They contend that H.B. 144 simply clarified the statutory language—without modifying the substance—to prevent future denials of coverage on the grounds that loss of use damages are not explicitly mentioned.

While a subsequent revision to statutory language is not controlling as to the law's prior meaning, it may be helpful to determine legislative intent. *Chesek v. Jones*, 406 Md. 446, 462 (2008) (citing *Reier v. State Dep't of Assessments & Taxation*, 397 Md. 2, 35 (2007)). It is undisputable that IN § 19-509's new language, which takes effect on October 1, 2020, now expressly incorporates loss of use damages into the statute. This does not mean, however, that the former statutory language did not encompass loss of use damages where such explicit language was lacking. We are persuaded that H.B. 144 simply clarified the statute to expressly state that loss of use damages are covered. This conclusion stems from the legislation's origin as a departmental bill, *Blackstone*, 461 Md. at 126 n.19, and purpose paragraph.

A purpose paragraph, which describes what the bill does, provides insight into legislative intent. *Duffy v. CBS Corp.*, 458 Md. 206, 229 (2018); *see also Chesek*, 406 Md. at 462 (gleaning that the use of the word "clarifying" in a purpose paragraph indicates that the revision of statutory language, in fact, clarified existing law without making substantive changes); *Johnson v. Mayor & City Council of Balt.*, 430 Md. 368, 389 (2013) (discussing *Chesek* and noting that "the General Assembly's actions in 'clarifying' the law did not create a new power but merely acknowledged a power already in existence"). Here, H.B. 144's purpose paragraph states that the legislation is intended

> FOR the purpose of *clarifying* that certain motor vehicle liability insurance policies must contain coverage for damages . . . that the insured is entitled to recover from the owner or operator of certain motor vehicles because of property damage, including the loss of the insured vehicle.

2020 Md. Laws, ch. 77 (emphasis added). Indeed, H.B. 144 acknowledges the coverage already in existence and serves to prevent future insurers from attempting to deny coverage for those losses in accord with the purpose of the uninsured motorist statute. Mindful of our independent statutory interpretation, we think that H.B. 144's unanimous passage in the General Assembly confirms that loss of use damages are, and always were, a component of damage to property.

## D.     *Application to the Present Cases.*

As a final matter, we apply this interpretation to both cases before the Court. First, though, we must address the apparent exclusion of loss of use damages from both motor vehicle insurance policies.

30

It is not a novel proposition that an insurance policy omitting or purporting to exclude statutorily required coverage will be read as if the policy contains the minimum amounts of required coverage because such omissions and exclusions are void. *Nationwide Mut. Ins. Co. v. U.S. Fid. & Guar. Co.*, 314 Md. 131, 135 (1988); *see also Forbes v. Harleysville Mut. Ins. Co.*, 322 Md. 689, 698 (1991) ("[L]imitations on coverage or exclusions in insurance policies, which are inconsistent with the purpose of the uninsured motorist statutory provisions, are unenforceable."). If the statutory language of the Insurance Article denotes broader coverage than the applicable insurance policy, the statutory language prevails. *Heffernan*, 399 Md. at 610. Therefore, because we conclude today that the phrase "damage to property" as incorporated by the uninsured motorist statute includes loss of use damages, we shall read Mr. Queen's and Ms. Hoyle's respective policies as providing the same.

In Misc. No. 10, we answer the certified question of the U.S. District Court in the affirmative. Maryland's Uninsured Motorist Statute requires an insurer to pay benefits for loss of use of a vehicle damaged by an uninsured driver as those damages are a component of "damage to property," notwithstanding the insurer's attempt to provide less coverage than is statutorily mandated.

In No. 63, we reverse the judgment of the Circuit Court for Baltimore City. The Associate Commissioner correctly determined that State Farm's denial of coverage

31

violated the Insurance Article.  We remand No. 63 to the Circuit Court for Baltimore City for further proceedings consistent with this opinion.

## CONCLUSION

In consideration of the ordinary and popular meaning of the words "damage" and "property," bolstered by this Court's prior interpretations of property damage, and the context and purpose of the uninsured motorist statute, we conclude that the phrase "damage to property" includes loss of use damages.

**IN MISC. NO. 10, CERTIFIED QUESTION OF LAW ANSWERED. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**

**IN CASE NO. 63, THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY IS REVERSED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.  COSTS TO BE PAID BY RESPONDENT.**